

FILED

Dec 17 2019, 11:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel J. Vanderpool
Vanderpool Law Firm, P.C.
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Matthew E. Reust,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 17, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2887<br><br>Appeal from the Wabash Circuit<br>Court<br><br>The Honorable Robert R.<br>McCallen, III, Judge<br><br>Trial Court Cause No.<br>85C01-1509-FC-852 |

**Barteau, Senior Judge.**

## Statement of the Case

Matthew E. Reust appeals after a jury trial from his convictions of one count of home improvement fraud,[1] as a Level 5 felony, and one count of theft,[2] as a Level 6 felony. We affirm in part, reverse in part, and remand with instructions.

## Issues

Reust presents the following issues for our review which we consolidate and restate as the following questions:

> I. Does the home improvement fraud statute apply to Reust's conduct, and, if so, is the evidence sufficient to support his conviction of Level 5 felony home improvement fraud?

> II. Is the evidence sufficient to sustain Reust's conviction for Level 6 felony theft?

## Facts and Procedural History

In 2012, sixty-one-year-old Alex Ramsey ("Alex") had recently retired from his job. He and his wife, Jacqueline ("Jackie"), were rearing their grandson in Fishers. The Ramseys' grandson hoped to attend North Manchester High

---

[1] Ind. Code §§ 35-43-6-12(a) (2006); 35-43-6-13(c)(1) (2014).

[2] Ind. Code § 35-43-4-2(a)(1)(A) (2014).

School. In support of their grandson's wishes, they purchased thirty acres of land near Sycamore Golf Course in Wabash County.

[4] In October 2012, the Ramseys entered into a contract with Tim Howell Construction to build a custom ranch-style home on the land for $472,579.00. Tim Howell ("Howell") was a general contractor from Columbia City. Howell suggested architects and designers to help Alex finalize plans for the new construction. When complete, the Ramseys' home was to be a 4,300 square-foot ranch-style home with a brick exterior and a full, finished basement. Under the terms of the contract, which was drafted by Alex, the various phases of construction included site preparation by clearing several acres of woods, installation of a water well, and house construction. A line item regarding the house construction included landscaping, with a contracted price of $28,444.00.

[5] Howell started construction on the land in the spring of 2013, after the weather had improved and the Ramseys had secured financing for the project. As of August 2013, the site had been cleared, the exterior walls of the home had been built, and the roof had been installed.

[6] Sometime in the fall of 2013, instead of adding fill dirt around the foundation in the back of the home, the Ramseys decided to add a patio. A patio was not part of the original construction contract with Howell. Someone at church mentioned to Alex that Reust was trying to start up a business and that it would be nice to help him find projects. Alex contacted Reust and they toured other

jobs Reust had completed. Alex, who was pleased with the work finished at other projects, decided to hire Reust to complete the patio.

[7] Alex prepared the contract for the two to sign, and it was signed on November 5, 2013. Alex and Jackie agreed to pay Reust $12,311.32 for the project. Alex paid Reust $9,300.00 up front for the purchase of materials. During the course of the work, the Ramseys decided to expand the project and the overall cost was increased to reflect the changes.

[8] Reust did some of the work in the fall of 2013 and finished the project in May 2014. Alex was "generally satisfied" with Reust's work at the time with the exception of the work done on the retaining wall near the patio. Tr. Vol. II, p. 63. Alex paid Reust $16,964.50 for the patio project but withheld $461.82 because the retaining wall had not been completed to his satisfaction.

[9] At about the same time as Reust was finishing the patio project, the Ramseys were looking for a landscaper. Reust approached Howell, asking him to recommend him to the Ramseys for that project. Howell did recommend him for the job.

[10] Reust prepared a master plan for the landscaping at the house. After the Ramseys agreed to the plan, Reust provided a quote for the landscaping project on June 3, 2014. The total cost of the project was $22,749.00. The quote included a breakdown of the cost for lava rock, grass seed, fertilizer, straw, boulders, fieldstone, lighting, plants, fencing, and labor, along with a few other

line items. The Ramseys agreed to Reust's price and Alex instructed Reust to begin the work.

[11] On June 7, 2014, Howell wrote a check to Reust for $15,000.00 as an advance payment toward the landscaping job. That check was written from Howell's business account. Exhibit Vol. I, pp. 47-48.

[12] Reust performed only a small amount of the landscaping work, including installing a fence around the air conditioning unit, installing blocks along the stairs, and, according to Howell, moving some dirt around for about twenty minutes. By August, Reust had not planted grass seed in the yard or had any plants delivered to the Ramseys' home. Alex then started contacting Reust on a regular basis in an effort to urge him to follow through with the landscaping project.

[13] On September 10, 2014, Reust asked Alex for $5,000.00 toward the landscaping work. Alex, who was unaware that Howell had already advanced Reust $15,000.00 in June, wrote the check for $5,000.00. That check was written from the Ramseys' personal account. *Id.* at 45. Alex asked Reust if he would return to complete the work. Although Reust responded that he would return, he did not return to complete the work.

[14] Throughout September and October, Alex and Howell persistently called and texted Reust about completing the landscaping work to no avail. Eventually, at the end of October, Reust told Alex that he should hire someone else to do the job. Alex replied that he was disappointed and asked to meet with Reust to

discuss how to "make this project happen." Tr. Vol. II, p. 88. Reust would agree to appointments to meet with Alex, but frequently cancelled the meetings with excuses for not being able to meet. The construction of the house was completed in November 2014, but the yard was a "mud pit" heading into the winter season with no grass or plants. *Id.* at 162. The Ramseys moved into the home in late 2014 or early 2015. Reust returned to the property just once in December 2014 to drop off some landscaping lights outside the garage.

[15] Reust did not refund the $20,000.00 he received to complete the landscaping work and did not return to the site to finish the project. The Ramseys eventually completed the landscaping work themselves with the help of Howell and another landscaper they hired.

[16] Of the materials promised under the agreement, Reust was to provide and complete as follows: (1) flagstone valued at $270.00; (2) a pallet of large native boulders, valued at $161.00; (3) a pallet of medium native boulders, valued at $322.00; (4) a pallet of Tennessee fieldstone, valued at $170.00; (5) landscaping lighting, valued at $500.00; (6) rope lighting, valued at $250.00; and, (6) fence, valued at $750.00. The landscaping agreement provided for 200 hours of labor at a rate of $32.00 per hour. Alex estimated that two workers were on the property for three days for approximately eight hours a day. In sum, Alex estimated that the labor and materials actually provided totaled $4,151.00. The labor and materials specified in the agreement, but not provided, totaled $18,388.07.

[17]     Public Law 158-2013, which became effective on July 1, 2014, made changes to Indiana's criminal code. The amendment reorganized felony offenses by numbers rather than letters. Because Reust's conduct straddled the effective date of the statutory changes, the State charged him under both the former and amended statutes. Count I alleged that Reust committed home improvement fraud as a Class C felony. Count II alleged that Reust committed theft as a Class D felony. Count III alleged that Reust committed home improvement fraud as a Level 5 felony. Count IV alleged that Reust committed theft as a Level 6 felony. Counts I and II covered the period of time from May 1, 2014 through June 30, 2014. Counts III and IV covered the period of time from July 1, 2014 through April 7, 2015.

[18]     During Reust's jury trial, he moved for a judgment on the evidence or, in the alternative, a dismissal of the home improvement fraud charges alleged in Counts I and III. In support of Reust's argument, he claimed that the home improvement fraud statute did not apply to his landscaping work because the project, as a whole, involved the original construction of a dwelling, which is exempted from the offense. The State responded that the landscaping work was separate from the construction of the home because it involved the modification or alteration of residential property. The trial court denied Reust's motions but permitted him to raise his arguments to the jury.

[19]     During closing argument, the State explained that it had charged Reust with two counts of the offenses because of the effective date of the July 1, 2014 criminal code revision. The State argued that there should not be four guilty

verdicts, rather the jury should determine on what date the offenses were committed. After the State conceded that the theft charge as alleged in Count II should not result in a guilty verdict, the trial court dismissed Count II.

[20]   The jury found Reust guilty of home improvement fraud as a Level 5 felony and theft as a Level 6 felony. Reust now appeals.

# Discussion and Decision

## I. Home Improvement Fraud Statute

[21]   The crux of this issue is whether the home improvement fraud statute applies to Reust's acts. Appellate courts review matters of statutory interpretation de novo because they involve pure questions of law. *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010). "Of course, '[t]he primary purpose of statutory interpretation is to ascertain and give effect to the legislature's intent.'" *Id*. (quoting *State v. Oddi-Smith*, 878 N.E.2d 1245, 1248 (Ind. 2008)). "The statute itself is the best evidence of this intent." *Id*. "'The Court presumes that the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals.'" *Id*. (quoting *State v. Oddi-Smith*, 878 N.E.2d 1245, 1248 (Ind. 2008)).

[22]   "When the statutory language is clear and unambiguous, we give effect to its plain and ordinary meaning." *Pierce v. State*, 29 N.E.3d 1258, 1265 (Ind. 2015). "Where the language is clear and unambiguous, there is 'no room for judicial construction.'" *Jackson v. State*, 50 N.E.3d 767, 772 (Ind. 2016) (quoting *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 704 (Ind. 2002)).

"In other words, when the meaning of the words is plain on paper, we need not resort to other rules of statutory construction to divine intent." *Id.*

[23] Additionally, "[p]enal statutes should be construed strictly against the State and ambiguities should be resolved in favor of the accused." *Merritt v. State*, 829 N.E.2d 472, 475 (Ind. 2005). However, statutes should not be read so narrowly that cases they would fairly cover would be excluded. *Id.* With that framework set out, we turn to the relevant statutes.

[24] Indiana Code section 35-43-6-1(1987) provides that the chapter "applies only to residential property, which means real property used in whole or in part as a dwelling by a consumer and includes all fixtures to, structures on, and improvements to the real property." The statutory definition of residential property, for purposes of Indiana Code chapter 35-43-6, has the meaning set forth in Indiana Code section 35-43-6-1. Ind. Code § 35-31.5-2-276 (2012). A dwelling is defined by Indiana Code section 35-31.5-2-107 (2012), as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging."

[25] A person is defined, as used in Indiana Code chapter 35-43-6 as "an individual, corporation, business trust, estate, trust, partnership, association, cooperative, or any other legal entity." Ind. Code § 35-43-6-7 (1987). A consumer is defined for purposes of this chapter as "an individual who owns, leases, or rents the residential property that is the subject of a home improvement contract." Ind. Code § 35-43-6-2 (1987).

[26]     A home improvement is defined as "any alteration, repair, or other modification of residential property. However, this chapter does not apply to the original construction of a dwelling." Ind. Code § 35-43-6-3 (1987).

[27]     For purposes of this chapter, a home improvement contract is defined as "an oral or written agreement between a home improvement supplier and a consumer to make a home improvement and for which the contract price exceeds one hundred fifty dollars ($150)." Ind. Code § 35-43-6-4 (1987). Additionally, Indiana Code section 35-43-6-6 (1987) provides that a home improvement supplier is "a person who engages in or solicits home improvement contracts whether or not the person deals directly with the consumer." The home improvement contract price, as used in this chapter, is defined as "the amount actually charged for the services, materials, and work to be performed under the home improvement contract . . . ." Ind. Code § 35-43-6-5 (1987).

[28]     In pertinent part, a home improvement supplier commits the offense of home improvement fraud when a home improvement supplier enters into a home improvement contract and knowingly promises performance that the home improvement supplier does not intend to perform or knows will not be performed. Ind. Code § 35-43-6-12(a)(3). The offense is enhanced to a Level 5 felony, in pertinent part, if: (1) it is a violation of section (a)(3) and; (2) the consumer is at least sixty (60) years of age and the home improvement contract price is at least ten thousand dollars ($10,000)." Ind. Code § 35-46-6-13(c)(1)(A).

[29] The State contends that the facts of this case fall squarely within the plain language of the home improvement fraud statute. The State argues that Alex's property was residential property as defined above because Alex, his wife, and his grandson intended to use their home as a dwelling during the first part of the charged timeframe and they did use their home as a dwelling during the remainder of the charged timeframe. The State further argues that the plain language of the statute does not require the consumer to be living inside a dwelling at the time the work is being performed for real property to qualify as residential property. The State also asserts that Reust's landscaping work also qualified as a home improvement because it involves the alteration or modification of residential property. Last, the State claims that the statute's exemption of original construction does not apply to landscaping, contending that landscaping does not result in the construction of a dwelling.

[30] Reust, on the other hand, argues that the plain language of the statute is applicable to real property used in whole or in part as a dwelling by a consumer. He contends that if the legislature had intended for the statute to include "real property used *or to be used* in whole or in part as a dwelling", it would have done so. Appellant's Br. p. 21.

[31] We agree with Reust that the plain language of the statutes defining home improvement and dwelling require the consumer to live in the dwelling at the time of the home improvement. This reading of the statutes does not conflict with the statutory exemption for new construction.

[32]   Furthermore, it is undisputed that this was the construction of a new home. A line item in the home construction agreement included landscaping. Howell had contacted a landscaper to be a subcontractor, but that landscaper was not chosen. Instead, Reust served as the landscaping subcontractor. However, Reust did not complete the work after accepting advance money, which he never offered to return. Ultimately, Alex, his wife, his grandson, Howell, and another landscaper helped to complete the landscaping.

[33]   In *Tucker v. State*, 646 N.E.2d 972, 975 (Ind. Ct. App. 1995), we held that spraying for termites on two existing homes was a home improvement under the statute. In that case, the home improvement supplier targeted an eighty-two-year-old woman. He stated he was there to inspect for termites, but then convinced the woman to allow him to spray her home for termites he claimed he had found. He charged her $2,400.00 for the forty-five-minute job. Another man was across the street spraying the rental property the woman also owned. He charged the woman $96.00 for the services provided at the rental property. However, when the check was endorsed, the amount on the check had been altered to $9,600.00.

[34]   On appeal, in an attempt to reduce the enhanced sentence, Tucker argued that the woman's rental property was not residential property for purposes of the home improvement fraud statute. We held that, though the evidence was scant, it was sufficient to establish that the woman's rental house was residential property. *Id.* at 976.

Therefore, although the woman did not live in the rental property, the rental house was a place in which tenants could reside and tenants may have been residing there at the time. By contrast, in the current case there is no dispute that the Ramseys' home was unlivable when Reust was supposed to have done the landscaping work. This is further support of our conclusion that an existing home must be occupied by the owner or existing rental property must be available to be occupied by a tenant for purposes of establishing that it is residential property upon which home improvements can be made.

Our research has revealed no cases in Indiana deciding whether landscaping to be installed around the original construction of a home falls under the home improvement fraud statute.[3] Nonetheless, under the wording of our statutes,

---

[3] Other states have handled the issue of landscaping as respects home improvement. It is sometimes appropriate to review caselaw from other states for guidance in interpreting similar provisions. *See Jordan ex rel. Jordan v. Deery*, 778 N.E.2d 1264 (Ind. 2002) (looking for guidance from other states for interpretation of similar constitutional provisions).

In *Hakimi v. Cantwell Landscaping & Design, Inc.*, 855 N.Y.S. 273 (N.Y. 2008), a property owner and a home improvement contractor hired to install landscaping at the construction site for the owner's new home, filed actions against each other, seeking summary judgment for their various positions on a claim for breach and a claim to foreclose on a mechanic's lien filed against the property. Resolution of the issue on appeal was whether the landscaping contractor was engaged in the construction of a new home. 855 N.Y.S. at 275. This determination would resolve whether the landscaping contractor was subject to licensing requirements in Suffolk County.

The applicable Suffolk County Code sections did not include definitions of "construction" or "home". However, Suffolk County Administrative Code section 345-16 defines home improvement contractor as "a person who engages in home improvement contracting upon residential property." 855 N.Y.S. at 275. It also defines "home improvement contracting" as "any repair, remodeling, alteration, conversion, modernization, improvement or addition to residential property, and includes but is not limited to . . . waterproofing, as well as other improvement to structures or upon land which are part of residential property, including landscaping and arboriculture . . . but shall not include the construction of a new home." *Id.*

The pertinent provision in the Southampton Town Code, section 143-1(A), defines "home improvement" as "the repairing, remodeling, altering, converting or modernizing of, or adding to, residential property and shall include, but not be limited to . . . landscaping . . . and other improvement of residential property and all

landscaping qualifies as a home improvement because it involves the alteration, repair, or other modification of residential property, but does not apply to the original construction of a dwelling.  *See* Ind. Code § 35-43-6-3.

[37]     We conclude that Reust's conduct did not fall under the Home Improvement Fraud Statute.  The landscaping project Reust was to perform was ancillary to the construction of the Ramseys' new home.  In fact, a line item for landscaping was included in the contract between the Ramseys and Howell.  Because this is landscaping at a new home construction site, and new home construction is excluded under the terms of the statute as it is not residential property, Reust's

_____

structures or land adjacent to it." *Id.*  The Southampton Town Code expressly excluded construction of a new home from the definition of home improvement. *Id.*

The Court concluded that inclusion of landscaping work performed at the property where a new home is being constructed "would require this Court to impermissibly rewrite a clearly worded statute to obtain a desired result." *Id.* at 276 (internal quotation omitted).  The Court reasoned that because the landscaping contractor was not building a new structure on the property, but was installing landscape materials and performing landscaping services, it was not engaged in the construction of a new home. *Id.*  Therefore, the Court not only found that landscaping was not excluded from the definition of a home improvement because the work performed did not result in the construction of a new home but found that landscaping was a home improvement under the plain language of the statute, which made an explicit reference to landscaping activities as home improvement.

Unlike the applicable code sections in New York, Indiana does not explicitly include landscaping within the definition of home improvement.  Other states such as Connecticut and New Jersey also include landscaping within the definition of home improvement. *See Drain Doctor, Inc. v. Lyman*, 973 A.2d 672 (Conn. 2009) (citing Connecticut's Home Improvement Act statute, which includes landscaping, in plumbing case where ancillary lawn repair and driveway repair was performed); *Czar, Inc. v. Heath*, 966 A.2d 1008 (N.J. 2009) (citing New Jersey's Home Improvement Practices Act, which includes landscaping, in case brought under New Jersey's Consumer Fraud Act involving installation of cabinets, doors, window casings and decorative molding); *Messeka Sheet Metal Co., Inc. v. Hodder*, 845 A 2d 646 (N.J. 2004) (citing New Jersey's Home Improvement Practices Act, which includes landscaping, in case brought under New Jersey's Consumer Fraud Act involving installation of air conditioning units).

The New York legislative bodies and those of Connecticut and New Jersey saw fit to include landscaping in the definition of home improvement, but the Indiana Legislature has chosen not to do so. Even so, under the language of Indiana's Home Improvement Fraud statute and caselaw interpreting the statute, landscaping is a home improvement, but only if it is performed on residential property.

landscaping is not an alteration, repair, or modification of residential property. Therefore, his conduct does not fall within the provisions of the Home Improvement Fraud statutes. Consequently, we reverse Reust's conviction for Home Improvement Fraud and remand with instructions that the trial court vacate the conviction.

## II. Sufficiency of the Evidence of Level 6 Felony Theft

[38] Reust also challenges the sufficiency of the evidence to support his conviction for Level 6 felony theft. Our standard of review of these claims is well established. "For a sufficiency of the evidence claim, we look only at the probative evidence and reasonable inferences supporting the verdict." *Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017). "We do not assess the credibility of witnesses or reweigh the evidence." *Id.* "We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.*

[39] In order to establish that Reust had committed Level 6 felony theft, the State was required to prove beyond a reasonable doubt as follows:

> A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class A misdemeanor. However, the offense is:
>
> (1) a Level 6 felony if:
>
> (A) the value of the property is at least seven hundred fifty dollars ($750) and less than fifty thousand dollars ($50,000)[.]

[40]    At trial, Alex testified that he had drafted the agreement with Howell, and the agreement was admitted as evidence at trial. Exhibit Vol. I, pp. 49-52. The terms of the agreement which are pertinent to this issue and the arguments presented are as follows:

> **SECTION III–PAYMENT AND INVOICING**
>
> 3.1 <u>Payment</u>. [Howell] agrees to complete the work herein based upon a six (6) payment draw schedule. [Howell] agrees that [Alex's] financial institution will inspect any work that is invoiced by [Howell] to insure satisfactory completion of said work prior to payment being rendered to [Howell].
>
> 3.2 <u>Invoicing</u>. [Howell] shall provide sufficient detail on all invoices to fully describe work for which billing is being rendered.
>
> **SECTION [IV]–COMPLIANCE & PERSONNEL**
>
> 4.1 <u>Qualified Personnel</u>. [Howell] warrants that all services rendered under this Agreement will be performed by qualified and experienced personnel and that all work will be in compliance with all federal, state and local laws, regulations and ordinances pertaining to services provided herein.
>
> * * * *
>
> **SECTION VI–GENERAL CONTRACTOR**
>
> 6.1 [Howell] agrees to perform [his] duties herein as [Alex's] primary contractor, which includes the complete oversight of all work required by [Howell] and any subcontractor "agent" required to properly complete the work herein.
>
> **SECTION VII–WORK SCOPE AND COST**

> 7.1 [Alex] will pay [Howell] for the satisfactory completion of the work herein based on a six (6) payment schedule, subject to the satisfactory inspection of [Alex's] financial institution and any governing agency requiring inspection be performed.
>
> 7.2 [Howell's] cost to complete site preparation, installation of a water well, mound septic system, driveway, and construction of [Alex's] house for four hundred seventy[-]two thousand five hundred seventy[-]nine dollars ($472,579.00). See attached cost breakdown for clarification of the various phases of construction.
>
> *Id.* at 50-51.

The cost breakdown included separate descriptions and pricing for: (1) site preparation; (2) water well; and (3) house construction. The house construction category included a line item for landscaping with a cost of $28,444.00. *Id.* at 52.

Reust's written proposal for the landscaping work was generally described as "New Landscaping all around house." *Id.* at 43. The total cost of his landscaping work was $22,749.00. *Id.*

During cross-examination, Alex was asked how much he had paid Howell. Alex testified that "I don't know that answer. Because we'd made some modifications to stuff as we went through and–and I paid him every so often based on what he needed." Tr. Vol. II, p. 100. He was then asked if he had any records of what he had paid to Howell. Alex responded that he did. He was asked how many separate checks he had written to Howell. Alex answered, "Well, I–I didn't really write him checks. Um, the bank–he would do draws at the bank." *Id.* He then testified that he had an escrow account or a

construction loan with a bank. *Id.* at 101. Alex stated that there was a procedure through the bank for submitting invoices and the bank would pay the invoice out of the proceeds of the construction loan. *Id.* He clarified that if there were any additions not included in the home construction contract, he and his wife would pay Howell with their own funds, and not the proceeds of the construction loan. *Id*.

[44] With respect to financing, Howell testified that in most instances when a construction loan is set up with a bank, the bank will ask for an itemization of the various components of the construction. *Id.* at 126. The bank will cover or issue proceeds for those various items up to the cost listed in the itemization. *Id.* at 127. He explained that because the patio was not on the itemized list submitted to the bank, Alex and his wife had to pay for that project separately. *Id.*

[45] Howell testified that he wrote a check to Reust for $15,000.00 as prepayment on the landscaping work. He also testified that Alex had issued a personal check for $5,000.00. Howell stated a generous estimate of the amount of landscaping work completed by Reust would be $1,500.00. He later modified that estimate to $2,000.00.

[46] During cross-examination, Howell testified further about financing and construction loans. He stated that the landscaping was in the list of itemized projects. Even though it was a listed item, he wrote the check from his business account. His check was an advance, because he knew that the bank, at the end

of the job, would reimburse that. *Id.* at 146. He also stated that the bank paid an amount up to the itemized amount, $28,444.00, for the landscaping work because they could not have closed on the loan otherwise. Ultimately, Howell was reimbursed for the $15,000.00 advance to Reust from the construction loan proceeds.

[47] Reust argues that Howell was not a victim of theft because he was reimbursed from the construction loan. He further argues that if Alex and his wife were the victims of a theft, the evidence shows that they advanced $5,000.00 to Reust, and received approximately $4,500.00–Alex's estimate–of work from him. Reust contends that Alex's loss would be $500.00, less than the statutory minimum for Level 6 felony theft.

[48] The State contends that Reust did not refund any of the $20,000.00 advanced to Reust. Howell received reimbursement for his $15,000.00 from the proceeds of the construction loan. The evidence does show that Alex paid $5,000.00 and received $4,500.00 in landscaping work from Reust, thus, leaving him with a loss of $500.00. However, Alex and his wife had to pay off the construction loan, including the distribution of funds for landscaping. The amount paid by the bank for the landscaping work is unclear from the record, because the construction loan authorized an amount up to $28,444.00. Yet, the record shows that, at a minimum, Reust received $20,000.00, performing only $4,500.00 of landscaping work. Therefore, Alex's losses were at least $15,500.00.

[49] We agree with the State's argument and conclude that the evidence is sufficient to support Reust's conviction for Level 6 felony theft. That said, we remand this matter to the trial court to resentence Reust for his theft conviction and to hold a restitution hearing for an accurate determination of Alex's losses.

[50] In *Duren v. State*, 720 N.E.2d 1198 (Ind. Ct. App. 1999), the defendant contended on appeal that he was inappropriately charged with theft, when he should have been charged with home improvement fraud. The defendant received a check for $3,862.16 from the homeowners for the installation of custom windows and doors at their home. The company the defendant used ordered the materials COD or cash on delivery. Although the windows were received by the company, the defendant never paid for or picked up the materials. There does not appear to have been a written contract between the homeowners and the defendant.

[51] As respects the defendant's claim that he was improperly charged, we observed that the elements of theft and the elements of the home improvement fraud statute "contain elements that are quite different and do not address the same subject matter." *Id.* at 1203. Therefore, it is possible for a defendant to be properly charged with one of those two offenses instead of the other. It follows that it is appropriate for us to find the evidence insufficient on the home improvement fraud conviction, while finding the evidence sufficient to support the theft conviction.

# Conclusion

In light of the foregoing, we conclude that the facts as proven do not show that Reust's conduct falls under the Home Improvement Fraud statute. However, the evidence is sufficient to support Reust's conviction for one count of theft. The matter is remanded to the trial court with instructions to vacate Reust's home improvement fraud conviction, resentence Reust for his theft conviction and hold a hearing to determine the amount of restitution which is owed.

Affirmed in part, reversed in part and remanded with instructions.

Kirsch, J., and Altice, J., concur.